IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| ESPERANSO G.,[1] | § | |
|     PLAINTIFF, | § | |
| | § | |
| V. | § | CASE NO. 1:24-CV-20-BK |
| | § | |
| COMMISSIONER, SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
|     DEFENDANT. | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to 28 U.S.C. § 636, and the parties' consent to proceed before the undersigned United States magistrate judge, Docs. 7-8, Plaintiff's appeal of the denial of her application for Social Security disability benefits is before the Court for determination.[2] Plaintiff argues that the ALJ erred as a matter of law by failing to evaluate whether her debilitating migraine headaches medically equaled listing 11.02B and by failing to account for the headaches in the determination of Plaintiff's residual functional capacity (RFC). Doc. 15-2 at 11-20. She also argues that the ALJ's RFC assessment is not supported by substantial evidence because it does not account for limitations resulting from Plaintiff's chronic migraine headaches or neck and shoulder impairments. Doc. 15-2 at 21-24.

---

[1] The Court notes that Plaintiff's first name is spelled three different ways throughout the record; however, the Court adopts the spelling "Esperanso," as used by Plaintiff in her amended Social Security benefits applications and pleadings. Doc. 11-1 at 195-98; Doc. 1; Doc. 15.

[2] Plaintiff's pleading, Doc. 15, does not comply with the requirements of the Court's *Scheduling Order*, Doc. 9 at 1-2 (pursuant to amended Social Security regulations), requiring that the parties file briefs, rather than motions for summary judgment. In *this* instance, the Court will construe the pleading (which is also inexplicably filed as a motion for remand) as Plaintiff's opening brief. Counsel is admonished, however, that repeat disregard for the Court's stated procedure may result in the offending pleading being struck.

Upon review of the record and the applicable law, the Court concludes that Plaintiff's arguments fail. And for the reasons detailed herein, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

### A. Procedural and Factual Background

Plaintiff seeks judicial review of the Commissioner's final decision denying her application for Social Security Disability Insurance (SSDI) benefits under Title II of the Social Security Act (the "Act") and Supplemental Security Income (SSI) under Title XVI of the Act. Doc. 1 at 2; Doc. 15-2, *passim*. Plaintiff filed her applications for SSDI and SSI in July 2021, both applications alleging disability beginning in June 2021. Doc. 15-2 at 4-6; Doc. 11-1 at 18, 21, 187-94. Plaintiff's claim was denied at all administrative levels, and she now appeals to this Court under 42 U.S.C. § 405(g). Doc. 1 at 1-3; Doc. 11-1 at 5, 15, 88, 93, 111, 114; Doc. 15-2 at 4-5.

Plaintiff, born in 1969, was 51 years old on her alleged disability onset date, attended school through the 11th grade, obtained a GED, and previously worked as a cashier, cook and food preparer, and landscaper. Doc. 15-2 at 5; Doc. 11-1 at 25, 230, 703.

### B. Relevant Medical History[3]

In support of her claims, Plaintiff relies on medical history beginning in September 2020. Doc. 11-1 at 346-71. Plaintiff has various medical diagnoses, including cervicalgia, cervical radiculopathy, cervical spondylosis, cervicothoracic bulges, cervical mild facet and

---

[3] References herein to medical evidence that predates Plaintiff's stated disability onset date are for context only.

neuroforaminal stenosis, osteoarthritis, arthralgia, and chronic migraines.[4] Doc. 11-1 at 358-60, 362-63, 366, 451, 454, 688, 865, 916; Doc. 15-2 at 11.  She has received treatment for, *inter alia*, chronic back, neck, and shoulder pain, along with migraines, stating that she tried and failed conservative therapies including exercise, physical therapy, rest, muscle relaxers, and pain medications.  Doc. 11-1 at 440, 443, 450, 475, 781-82, 788; Doc. 15-2 at 8.

     Such treatment also included various injections, such as trigger point, epidural steroid ("ESIs"), nerve block, corticosteroid, and nonsteroidal anti-inflammatory drugs ("NSAIDs"). Doc. 11-1 at 446-49, 456-61, 475, 494, 501-04, 540, 619-20.  Plaintiff's prescribed medications included Lyrica (pregabalin), hydrocodone, oxycodone, and Marcaine (bupivacaine HCI) for her chronic back, neck, and shoulder pain, Doc. 11-1 at 45-46, 262, 289, 304-05, 363, 440-41, 453, 685, 807, 864; topiramate and Botox injections for her migraine headaches, Doc. 11-1 at 688, 788, 839, 866; and an inhaler, loratadine, methylprednisolone, Flonase, and acetaminophen-codeine (Tylenol with codeine #4) for her allergy, respiratory, and sinus symptoms, Doc. 11-1 at 354-55, 367, 440-41, 615, 727, 733, 738, 746; Doc. 11-1 at 46.  Intermittently, for a variety of reasons—including cost, lack of transportation, other medications, and pharmacy issues—Plaintiff did not fully adhere to her physician's instructions to fill her medications and pursue recommended treatment options.  Doc. 11-1 at 453, 811.

     Plaintiff was seen by Dr. Scott W. Barclay, D.O., her primary care provider, on September 29, 2020, after being in a motor vehicle accident nine days prior.  Doc. 11-1 at 367-71; Doc. 15-2 at 7-11.  In her various visits with Dr. Barclay, Plaintiff consistently reported, *inter alia*, chronic

---

[4] Medical providers have assessed Plaintiff's migraines differently (*e.g.*, complicated by status migrainosus or transformed), but there is agreement that the migraines are chronic.  Doc. 11-1 at 688, 790, 793, 865.  Additionally, she has specifically not been diagnosed with lumbosacral radiculopathy or plexopathy in her lower extremities after being undergoing various tests, including nerve conduction studies.  Doc. 11-1 at 831, 843-44.

3

neck and pain, shoulder pain, migraine headaches, musculoskeletal symptoms, and respiratory symptoms from allergies. Doc. 11-1 at 364-65, 368-69. Dr. Barclay diagnosed Plaintiff with cervicalgia, spinal bulges without myelopathy, and mild facet and neuroforaminal stenosis. Doc. 11-1 at 360, 362-63, 366, 473, 481. Afterwards, through November 2022, Plaintiff saw Dr. Barclay at least seven more times—both in-person and virtually.[5] *See generally* Doc. 11-1 at 346-71, 471-75, 647-48, 685-716; Doc. 15-2 at 7-11.

Upon the referral of Dr. Barclay, Plaintiff was seen several times between December 2020 and August 2022 at the pain management clinic at Martin County Hospital District by Keith Gist, CRNA (certified registered nurse anesthetist). Doc. 11-1 at 363, 440-50, 453-54, 475, 539-40, 545; Doc. 15-2 at 9-10. Nurse Gist administered various treatments, including: (1) a trigger point injection to Plaintiff's left neck and shoulder, Doc. 11-1 at 446-49; (2) a cervical ESI (epidural steroid injection), Doc. 11-1 at 456, 458-61; a lumbar transforaminal right ESI, Doc. 11-1 at 494, 501-04; and an intramuscular Kenalog and Toradol injection, Doc. 11-1 at 540.

In November 2022, Plaintiff also was seen at Shannon Clinic Magdalen Neurosurgery ("Shannon") by Margaret Nunez, FNP-C (certified family nurse practitioner) for a neurosurgery consultation, complaining of back pain and headaches—"a chronic problem," despite having completed three months of physical therapy, home exercises, and "3 nerve block/epidural steroid injections in the [previous] year." Doc. 11-1 at 781-82, 788; Doc. 15-2 at 8. In December 2022,

---

[5] Throughout this period, Plaintiff was seen in the emergency department of the Scenic Mountain Medical Center several times for various reasons, including her recurring chronic pain and other problems like COVID-19, respiratory symptoms, and chest pains. Doc. 11-1 at 302-05, 612-20, 626-27, 655-59, 685; Doc. 15-2 at 9. Imaging and test results from these emergency visits were largely normal. Doc. 11-1 at 303-04, 619-20, 627-28, 659, 666-67, 687, 690.

Plaintiff received a lumbar facet block injection using a medial branch technique at Shannon, as was recommended by Nurse Nunez at the prior visit.  Doc. 11-1 at 804-05.

In connection with her disability application and in the weeks just prior to the administrative hearing, Plaintiff was seen a few times by Dr. Chris W. Vanderzant, D.O.  Doc. 11-1 at 790, 793, 852, 864; Doc. 15-2 at 8.  She self-reported that her "[h]eadaches are associated with nausea, ataxia, and aversion to loud noise and bright lights."  Doc. 11-1 at 864-65.  However, upon physical examination, Dr. Vanderzant noted:

> On examination she is a middle-aged woman of short stature, plump habitus, complaining of multifocal arthralgias.  She is normo cephalic with a lot of guarding on attempted range of motion cervical spine.  She was diffusely tender on palpation of posterior cervical, lateral cervical, and upper shoulder musculature, also had arthritic pain with range of motion at both shoulders.  There was no scapular winging, no meningeal or radicular signs.  She had adequate vision and hearing.  Cardiac rhythm is regular, lungs clear, no carotid bruits, no detected thyromegaly.  Abdomen was soft.  She was generally tender on palpation of joints and large muscle masses in all 4 extremities, with reduced range of motion lumbar spine but negative straight leg raising.
>
> There was no aphasia, apraxia, neglect.  No bulbar weakness was detected on cranial nerve examination.  There was no nystagmus, visual fields were full, full extraocular movements, normal pupillary reactions.  She had give-way on testing muscle strength in all 4 extremities, no arm drift, a slow arthritic gait without focal features.  There was no arm drift.  She denied lateralized sensory loss, muscle stretch reflexes were symmetric.

Doc. 11-1 at 865.  Nerve conduction studies and electromyography on Plaintiff's lower extremities also revealed no abnormality.  Doc. 11-1 at 831, 843-44.  Ultimately, Dr. Vanderzant's assessment was "chronic daily headaches (transformed migraine), probably exacerbated by multiple concussions."  Doc. 11-1 at 865.

### C. State Agency Medical Consultants' Findings

In March 2022, at the initial stage of the disability application process, a state agency medical consultant ("SAMC"), Dr. Laurence Ligon, M.D., found there was "[i]nsufficient

evidence to make a medical decision . . . ," noting that Plaintiff "[had] not returned the work history or function report forms" and that she and her "legal rep [had] not responded to letters and calls." Doc. 11-1 at 64, 68. Dr. Ligon considered Listing 1.18, abnormality of major joints in any extremity, finding that Plaintiff had two medically determinable impairments (MDIs): primarily, a severe disorder of the skeletal spine; and secondarily, an MDI for which there was medical evidence that was insufficient to establish a particular diagnosis. Doc. 11-1 at 64-65, 68-69. Dr. Ligon determined that Plaintiff was not disabled. Doc. 11-1 at 66, 70.

In August 2022, at the reconsideration stage, SAMC Dr. Murari Bijpuria, M.D., found that "[t]here [was] insufficient evidence to determine the case due to the claimant's failure to cooperate . . . ," likewise noting the lack of information and response from Plaintiff and her legal representative. Doc. 11-1 at 73-82. Dr. Bijpuria noted that "[r]easonable effort to obtain the claimant's cooperation to comply with a request for evidence or action has been completed, but has been unsuccessful, including telephone calls to the representative and letters sent to the representative and claimant." Doc. 11-1 at 74-75, 79-80. Dr. Bijpuria also determined that Plaintiff was not disabled. Doc. 11-1 at 75-76, 80-82.

### D. Plaintiff's Hearing Testimony

At the administrative hearing on February 7, 2023, Plaintiff testified that she had "real bad pain" in her middle and lower back when standing and sitting, that she could not stand more than ten minutes without sitting at least 10-15 minutes "to help with [her] pain," [d]epending on the weather," and that she had difficulty bending or turning. Doc. 11-1 at 40-41, 44. Plaintiff stated that she (1) had "tingling" down her arms, (2) had arthritis in her arm and hand causing swelling and the inability to bend two fingers, and (3) was unable to "really hold anything" or to reach with or straighten her left arm due to "numbness, stabbing, real bad pain." Doc. 11-1 at 42.

Plaintiff testified that she had two or three headaches (along with "real bad sinus") each week, which she explained "depends on the weather" and could be attributed to "bad allergies" Doc. 11-1 at 43. She stated that the headaches caused her to be unable to open her eyes and required her to remain in a "dark spot, all day." Doc. 11-1 at 43. Plaintiff averred that she cannot work "because of [her] condition of [her] back, [her] shoulders," explaining, "I'm just in pain every day. I'm just in pain. Like, it just, my whole body hurts, my head, my back, my shoulders just don't let me do what I used to do." Doc. 11-1 at 44.

Upon examination by the ALJ, Plaintiff testified that she cleans her house, including "sweeping and washing dishes," but is unable to stretch and bend to make her bed. Doc. 11-1 at 46-47. She stated that she cannot drive, so a friend takes her to do errands, including grocery shopping each week, but once at the store, she can push a basket. Doc. 11-1 at 47-48. She further stated that she does her own laundry, although her friend drives her to the laundromat and carries the laundry baskets. Doc. 11-1 at 47, 49. Plaintiff also testified that she attends church on Sundays and is able to stay through the whole service. Doc. 11-1 at 50-51. Plaintiff averred that "the Lyrica and the hydrocodone kind of eases the pain." Doc. 11-1 at 51.

### E. The ALJ's Findings

In June 2023, the ALJ found that Plaintiff met the insured status requirements of the Act and had not engaged in substantial gainful activity since June 18, 2021. Doc. 11-1 at 21. The ALJ also found that Plaintiff had the following severe impairments: (1) cervicalgia; (2) chronic back pain; (3) moderate osteoarthritis of the left shoulder; (4) chronic headaches; (5) obesity; and (6) chronic pain syndrome. Doc. 11-1 at 21. The ALJ concluded, however, that none of Plaintiff's severe impairments, or any combination thereof, met or "medically equal[ed]" an impairment listed in the applicable regulations. *See* Doc. 11-1 at 21 (citing 20 C.F.R.

§§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926) (giving "special emphasis" to listings: 1.15 ("[d]isorders of the skeletal spine resulting in compromise of a nerve root(s)"); 1.18 ("[a]bnormality of a major joint(s) in any extremity"); and 11.00 ("[n]eurological [d]isorders")).

The ALJ further found that Plaintiff retained the RFC to "perform a reduced range of light work primarily due to limitations related to her combination of impairments." Doc. 11-1 at 22-23. He specifically found:

> She is able to lift and carry 10 pounds frequently and 20 pounds occasionally. She is able to stand and walk for 6 hours in an 8-hour day and sit for 6 hours in an 8-hour workday. She is able to balance, stoop, kneel, crouch, crawl, and climb ramps and stairs occasionally, but should never climb ropes, ladders, or scaffolds. She should avoid hazards such as unprotected heights or dangerous moving machinery. She can perform frequent fingering and handling. She can perform detailed, but not complex, job tasks (due to headaches and chronic pain syndrome).

Doc. 11-1 at 21-22. The ALJ concluded that, while Plaintiff could not perform any past relevant work or the full range of light work, she is capable of performing other work as a dining room cafeteria attendant, food prep worker, or information clerk—jobs that exist in substantial numbers in the national economy. Doc. 11-1 at 25-26. Thus, the ALJ found Plaintiff is not disabled. Doc. 11-1 at 26-27.

## II. APPLICABLE LAW

An individual is disabled under the Act if, *inter alia*, she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months. 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner considers (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant's impairments are "severe"; (3) whether the claimant's impairment "meets or equals" one of the

8

listings in the relevant regulations; (4) whether the claimant can still do her past relevant work; and (5) whether the impairment prevents the claimant from doing any other available work. *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021) (citing 20 C.F.R. § 404.1520(a)(4)). The claimant bears the burden on the first four steps. *Id.* The burden then shifts to the Commissioner to "prove the claimant's employability." *Id.* (citation omitted).

The Court's review "is exceedingly deferential and limited to two inquiries: whether substantial evidence supports the ALJ's decision, and whether the ALJ applied the proper legal standards when evaluating the evidence." *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (cleaned up). The Court cannot "reweigh the evidence or substitute its judgment for the Commissioner's." *Id.* A finding that substantial evidence does not exist "is appropriate only if no credible evidentiary choices or medical findings support the decision." *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016) (citation omitted).

### III. ANALYSIS

#### A. The ALJ Did Not Err in Determining that Plaintiff's Headaches Did Not Meet or Equal a Listed Impairment.

Plaintiff contends that the ALJ erred as a matter of law by failing to consider whether her chronic and debilitating migraine headaches medically equaled dyscognitive seizures—listing 11.02B. Doc. 15-2 at 11-20; Doc. 17 at 2-4. Defendant responds that Plaintiff failed to meet her burden of proving that her headaches medically equaled the criteria of a listed impairment at step three. Doc. 16 at 5-10.

Plaintiff cites Social Security Ruling (SSR) 19-4p in support of her argument. *See* SSR 19-4p, 2019 WL 4169635, at *1 (Aug. 26, 2019) ("SSR [19-4] provides guidance on how [the

Commissioner] establish[es] that a person has a medically determinable impairment (MDI) of a primary headache disorder and how we evaluate [such] disorders in disability claims under titles II and XVI . . . ."). In relevant part, SSR 19-4p provides that:

> [w]e establish a primary headache disorder as an MDI by considering objective medical evidence (signs, laboratory findings, or both) from an [acceptable medical source ("AMS")]. We may establish only a primary headache disorder as an MDI . . . , not . . . secondary headaches . . . , because secondary headaches are symptoms of another underlying medical condition. . . . We will not establish the existence of an MDI based only on a diagnosis or a statement of symptoms. . . .

*Id.* at *5-6. Further, SSR 19-4p states that, the Commissioner may find that a primary headache disorder medically equals a condition under the statutory Listing of Impairments ("listing"), particularly epilepsy (listing 11.02) as it:

> is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.

> * * *

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

> * * *

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding,

remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

*Id.* at *7.

Here, though the ALJ did not cite SSR 19-4p in his decision, he adequately analyzed its factors when considering whether Plaintiff's chronic headaches medically equaled the listings under 11.02.

Specifically, the ALJ found that the medical records show Plaintiff suffered from chronic headaches that constituted a severe impairment, but that "there are few documented instances where the claimant complained of headaches to her healthcare providers . . . ." Doc. 11-1 at 23. Moreover, the ALJ expressly considered the effects of this severe impairment on Plaintiff's ability to perform substantial gainful activity, ultimately determining that the medical evidence demonstrates she can perform a reduced range of light work, subject to limitations, "at a higher level than alleged." Doc. 11-1 at 23-24. In reaching this conclusion, the ALJ indicated that he considered, *inter alia*, the CT scans of Plaintiff's head, Plaintiff's testimony at the administrative hearing, her complaints to various medical providers, and the medical providers' findings. Doc. 11-1 at 23, 46, 51-52; *see also* Doc. 11-1 at 25 ("[Plaintiff's] subjective complaints and limitations are simply not consistent with or supported by her admitted abilities, largely stable clinical findings, or longitudinal treatment record as discussed above."). Further, in his analysis, the ALJ gave "special emphasis" to the listed impairments in 11.00 regarding neurological disorders but, again, failed to find support in the medical records for a primary headache disorder sufficiently severe and frequent enough to medically equal a listing under 11.00. Doc. 11-1 at 21.

The Court's review of the record likewise reveals that while Plaintiff reported symptoms of debilitating migraine headaches, none of the objective medical evidence supported her claims.

*See, e.g.*, Doc. 11-1 at 831, 843-44, 864-65 (summarizing Plaintiff's encounters with Dr. Vanderzant); Doc. 11-1 at 702, 709, 715, 721, 782 (summarizing Plaintiff's test results and encounters with Dr. Barclay).  Again, the existence of an MDI is determined by "considering objective medical evidence (signs, laboratory findings, or both) from an AMS . . . [but not] only on a diagnosis or a statement of symptoms."  2019 WL 4169635 at *5-6.  However, here, the relevant medical records do not show consistent, ongoing treatment that corroborates Plaintiff's claim that she suffered "three headaches per week, lasting one hour to an entire day," but, rather, indicate that Plaintiff received conservative treatments that sometime provided relief.  Doc. 11-1 at 23; Doc. 11-1 at 46, 51-52 (testimony of pain relief from medications (including Lyrica, hydrocodone, an inhaler, and Flonase), injections (including Botox and ESIs), and other treatments).

      Moreover, at the administrative hearing, Plaintiff's own testimony suggested her headaches were not primary, but were secondary to sinus problems exacerbated by the weather.  Doc. 11-1 at 43; *see also* 2019 WL 4169635 at *5-6 (only primary, not secondary, headache disorders qualify as an MDI since "secondary headaches are symptoms of another underlying medical condition").  And except for merely suggesting sensitivity to light, Plaintiff did not testify at the administrative hearing to any other headache-related symptoms, such as seizures, noise sensitivity, cognitive impairment, convulsions, or lapses in thought.  Doc. 11-1 at 43-44.  Indeed, the record evidence indicates that Plaintiff only occasionally reported other symptoms occurring with her headaches to her medical providers.  *See, e.g.*, Doc. 11-1 at 310, 604, 786 (finding Plaintiff positive for nausea); Doc, 11-1 at 782 (reporting light as an aggravating factor); *but cf.,* Doc. 11-1 at 440, 443, 450-51, 453, 456, 865 (reporting that Plaintiff experienced no nausea, vomiting, or recent visual problems).

12

And while Plaintiff correctly states that "the **only listing** considered by the SAMCs was listing 1.18 which has no relevance at all to headaches," Doc. 15-2 at 13 (citing Doc. 11-1 at 81) (emphasis in original), she omits that each SAMC also noted that Plaintiff and her legal representative repeatedly failed to cooperate with requests for evidence, return function report forms, or work history, and to respond to calls or letters. Doc. 11-1 at 74-75, 79-81.

On this record, the Court thus concludes the ALJ did not err in finding that Plaintiff's headache disorder neither met nor equaled a listed impairment.

### B. The ALJ's Assessment of Plaintiff's RFC Is Supported by Substantial Evidence.

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because it fails to consider: (1) Plaintiff's symptoms or limitations relating to her chronic migraine headaches; and (2) Plaintiff's neck and shoulder impairments. Doc. 15-2 at 17-24; Doc. 17 at 4-7. Defendant responds that the ALJ properly assessed Plaintiff's RFC by considering all of the evidence in determining that Plaintiff was capable of a reduced range of light work. Doc. 11-1 at 21; Doc. 16 at 10-15.

The RFC is the ALJ's assessment, based on all relevant evidence, of a claimant's ability to work, despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). Stated differently, it is the most a claimant can do, notwithstanding her physical and mental limitations. *Id.* The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam) (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ is

13

solely responsible for assessing a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c); *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (per curiam) (holding that the RFC determination falls solely to the ALJ, who is responsible for resolving conflicts in the evidence).

Under the current regulations, ALJs do "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Nor must an ALJ's RFC finding "mirror or match a medical opinion." *Robert D.D. v. Kijakazi*, No. 3:21-CV-3164-C-BN, 2022 WL 16935248, at *4 (N.D. Tex. Oct. 31, 2022) (Horan, J.) (quoting *Carson v. Comm'r of Soc. Sec.*, 2022 WL 2525438, at *7 (E.D. Tex. May 25, 2022)), *adopted by*, 2022 WL 16927799 (Nov. 14, 2022) (Cummings, J.). Further, the absence of a medical opinion "'describing the types of work that the applicant is still capable of performing . . . does not, in itself, make the record incomplete.'" *Wills v. Kijakazi*, No. 22-20609, 2023 WL 4015174, at *3 (5th Cir. June 14, 2023) (per curiam) (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)); *see also Myers v. Kijakazi*, No. 20-CV-445, 2021 WL 3012838, at *4 (W.D. Tex. July 16, 2021), *adopted by*, 2021 WL 4025993 (Sept. 3, 2021) (explaining that the law does not require a positive statement or positive evidence from a medical source indicating a claimant can perform the demands included in the RFC). Such opinions are simply one category of evidence that the ALJ considers in assessing a claimant's RFC. *Wills*, 2023 WL 4015174, at *3 (citing 20 C.F.R. § 404.1513); *see also* 20 C.F.R. § 416.913 (categories of evidence for Title XVI applications). "[W]here no medical statement has been provided, [the court's] inquiry focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record." *Ripley*, 67 F.3d at 557.

Here, Plaintiff fails to show that the ALJ's RFC determination is not based on substantial evidence. Without citing any binding legal source, Plaintiff wrongly states that, "[a]s it relates to

14

headache disorders, courts have consistently held that when time off task or absenteeism is supported by the evidence of record, it should be included in the RFC." Doc. 15-2 at 17 (citing *Stewart v. Comm'r Soc. Sec.*, No. 3:23-CV-134-DAS, 2024 WL 1747649 (N.D. Miss. Apr. 23, 2024) (affirming the Commissioner's denial of benefits while holding that "limitations addressing ability to concentrate, remain on task, and maintain regular attendance . . . are not the only types of limitations that may be assessed in an RFC because of chronic headaches")); Doc. 15-2 at 17-18 (citing *Cooper v. Kijakazi*, No. 4:22-CV-118-DAS, 2023 WL 2467880, at *2 (N.D. Miss. Mar. 10, 2023) (affirming the Commissioner's denial of benefits where the plaintiff received treatment for headaches but her examination findings were normal, she indicated that over-the-counter medications helped relieve her symptoms, and her complaint of the aggravating effects of noise and stress was only documented once in the record and not corroborated by any objective medical evidence)). As the foregoing demonstrates, neither case supports Plaintiff's position.

Also, as Plaintiff concedes, "an ALJ does not have to assign limitations in the RFC unless the medical providers, examiners, or consulting physicians assigned such limitations." Doc. 15-2 at 17 (citing *Stewart*, 2024 WL 1747649, at *3). However, here, neither of Plaintiff's medical providers assigned any limitations based on her headaches. *See* Doc. 15-2 at 18 (citing *Cooper*, 2023 WL 2467880, at *2). And again, Plaintiff and her representative failed to cooperate with the SAMCs' evaluations.

As to the impact of Plaintiff's neck and shoulder impairments and chronic pain syndrome on the ALJ's RFC determination, Plaintiff argues that it was not supported by substantial evidence because: (1) "there are no limitations that, on their face, would account for Plaintiff's shoulder and chronic pain syndrome disorder"; (2) "the ALJ did not provide any suitable

15

explanation in the RFC narrative to explain how the assessed limitations would account for Plaintiff's shoulder and chronic pain syndrome disorder"; and (3) "the ALJ did not support the RFC with any medical opinions and instead relied on his own lay evaluation of raw medical data . . . ." Doc. 15-2 at 22.

Contrary to Plaintiff's assertions, here, the record is 'replete with medical documents' describing [Plaintiff]'s conditions, treatment, and recovery." *Wills*, 2023 WL 4015174, at *4 (quoting *Hardman v. Colvin*, 820 F.3d 142, 148 (5th Cir. 2016)).

Plaintiff's first and second arguments are not persuasive because the ALJ directly addressed Plaintiff's shoulder and chronic pain in providing limitations in the RFC assessment while sufficiently explaining his analysis of the same. Doc. 11-1 at 22-25. As an initial matter, the ALJ considered Plaintiff's testimony regarding her neck and shoulder pain and properly assessed her credibility against that of the objective medical evidence. Doc. 11-1 at 22. The ALJ determined that, though "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence . . . ." Doc. 11-1 at 22.

The ALJ's opinion indicates that he examined the relevant clinical findings and objective medical records, acknowledging that x-rays show "moderate degenerative osteoarthritis" and that Plaintiff had "abnormal range of motion and strength" in her left shoulder and spine. Doc. 11-1 at 22-23. The ALJ also considered the effects of treatment, including trigger point injections, ESIs, lumbar medial branch blocks, physical therapy, pain medications, and NSAIDs, stating that Plaintiff's "stable findings and conservative treatment history do not support a claim of disability." Doc. 11-1 at 23. The ALJ further noted that objective findings in the record

demonstrate largely that all her upper extremity testing for strength and movement were within normal limits. Doc. 11-1 at 23-24. He correctly recounted that the record and Plaintiff's testimony suggests that she "remained active and independent" despite her pain. Doc. 11-1 at 24; *see* Doc. 11-1 at 23 ("[T]he evidence shows that during the period of adjudication, the claimant generally possessed a normal gait and station and that she was able to ambulate without the use of any assistive devices."). When the ALJ considered Plaintiff's conditions as a whole in combination with all available evidence, as he was required to do, he found that "she had some limitation with regard to lifting and carrying, consistent with light work, primarily due to allegations of neck pain with radiculopathy in the upper extremities, low back pain with radiculopathy in the right lower extremity, [and] left shoulder pain . . . ." Doc. 11-1 at 24. For the same reasons, the ALJ also found further "limitations with regard to performing postural maneuvers and fingering and handling[,]" and limitations "to performing work that involves detailed, but not complex, job tasks" when working around hazards. Doc. 11-1 at 24. Such evidence, *in toto*, demonstrates both that the ALJ included limitations in his RFC and explanations in his analysis that would account for Plaintiff's shoulder, neck, and chronic pain syndrome.

  Likewise, the record does not support Plaintiff's third argument that the ALJ relied only on "his own lay evaluation of raw medical data to formulate the RFC" because, as detailed *supra*, his decision clearly shows that he did consider medical opinions in his assessment of all available relevant evidence. Doc. 15-2 at 22; *see* Doc. 11-1 at 24 (reference to medical opinions). It is true that "[a]n ALJ usually cannot reject a medical opinion without some explanation." *Webster*, 19 F.4th at 718 (citing *Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017)). But Plaintiff's contention that the ALJ did so lacks factual basis, as Plaintiff points to no

examples of medical opinions that were left out of the RFC determination. Doc. 11-1 at 24. In fact, the ALJ considered multiple medical opinions in his decision, including those of the SAMCs at both the initial and reconsideration stages, finding them unpersuasive. Doc. 11-1 at 24, 63-70, 73-82. The ALJ correctly notes that the SAMCs "determined there was insufficient evidence to adjudicate the claim," noting that they had very little evidence available to consider in their evaluation.[6] Doc. 11-1 at 24.

      The ALJ further noted his consideration of the medical opinions of, *inter alia*, Plaintiff's primary care provider, Dr. Barclay, and pain management specialist, Nurse Gist. However, the Court's review confirms conflicting medical opinions in the record—for example, Dr. Barclay noted consistently that Plaintiff has no difficulty walking, climbing stairs, dressing, bathing, or doing errands, while Nurse Gist stated that "[h]er pain keeps her from normal daily activities including sleeping, working, walking, sitting, standing." Doc. 11-1 at 450, 453, 456; *see also* Doc. 11-1 at 703, 710, 716, 722, 729, 735, 740 (providing that, when seen by Dr. Barclay, Plaintiff had no difficulty performing normal daily activities). Again, ALJs need not "defer or give any specific evidentiary weight . . . to any medical opinion(s) . . . ." 20 C.F.R. §§ 404.1520c(a), 416.920c(a); *see Robert D.D.*, 2022 WL 16935248, at *4, *adopted by,* 2022 WL 16927799 (noting that the ALJ's RFC finding need not "mirror or match a medical opinion"); *Wills*, 2023 WL 4015174, at *3 (explaining that medical opinions are simply one category of evidence that the ALJ considers in assessing RFC); *see also* 20 C.F.R. § 416.913 (categories of evidence for Title XVI applications). Given that, here, the ALJ considered and weighed all available relevant evidence, including various medical opinions, and determined that Plaintiff's

---

[6] Once again, the Court notes the inexplicable failure of Plaintiff and her representative to cooperate with the consultive examinations of the SAMCs. Doc. 11-1 at 64, 68, 74-75, 79-80.

account of the severity of symptoms was not as credible as the objective medical findings, substantial evidence in the record supports the ALJ's RFC finding.  Doc. 11-1 at 25.  To the extent Plaintiff invites the Court to re-weigh the evidence, that is something the Court cannot do.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED.**

**SO ORDERED** on March 26, 2025.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE